WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John J Clemens, | No. CV-17-00054-TUC-EJM |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff John J. Clemens ("Clemens") brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of Social Security ("Commissioner"). Clemens raises two issues on appeal arguing that the Administrative Law Judge ("ALJ") erred and abused his discretion by: 1) failing to find any severe impairments and 2) applying the wrong legal standard to assess Clemens's subjective symptom testimony. (Doc. 19).

Before the Court are Clemens's Opening Brief, Defendant's Response, and Clemens's Reply. (Docs. 19, 20 & 21). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure. For the reasons stated below, the Court finds that this matter should be remanded for further administrative proceedings.

## I.    Procedural History

Clemens filed an application for Disability Insurance Benefits ("DIB") on August 6, 2014. (Administrative Record ("AR") 55). Clemens alleged disability beginning on

March 10, 2014 based on fibromyalgia, scoliosis, and joint and muscle pain. *Id.* Clemens's application was denied upon initial review (AR 54, 63) and on reconsideration (AR 65, 76). A hearing was held on March 30, 2016 (AR 34), after which ALJ Peter J. Baum found, at Step Two, that Clemens was not disabled because he did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities. (AR 23, 29). On January 9, 2017 the Appeals Council denied Clemens's request to review the ALJ's decision. (AR 1).

Clemens's date last insured ("DLI") for DIB purposes is December 31, 2018. (AR 55). Thus, in order to be eligible for benefits, Clemens must prove that he was disabled during the time period of his alleged onset date ("AOD") of March 10, 2014 and his DLI of December 31, 2018.

## II. Factual History

Clemens was born on May 9, 1974 making him 40 at the AOD of his disability. (AR 55). He has past relevant work at a gas station, as a security guard, and as a waiter. (AR 154).

Clemens previously filed applications for DIB on August 11, 2011 and July 3, 2012 based on allegations of spine and shoulder problems, and both times was denied to other work. (AR 56).

### A. Treating Physicians

On November 14, 2013 Clemens was seen at St. Joseph's ER for evaluation of a lump on his left lower back. (AR 204). Clemens stated the lump had been there for 8–12 years and that he had history of chronic back pain, scoliosis, and right shoulder rotator cuff surgery. He reported no alcohol use and occasional marijuana use. On examination there was no back tenderness; the lump was minimally tender, most consistent with a lipoma, and required no medical intervention. (AR 205).

On June 11, 2014 Clemens was seen at El Rio for back, knee, and hip pain. (AR 232). Clemens described his back pain as aching and made worse by stair climbing, standing, and walking; a five year history of knee pain occurring occasionally; and aching

left hip pain. Clemens was positive for feeling down, depressed, or hopeless, and reported pain 7/10. (AR 233). The assessment was back pain, knee pain, hip pain, and polyarthralgia, and he was referred for x-rays, bloodwork, and PT. (AR 234). X-rays of the left hip, bilateral knees, and thoracic spine were normal. (AR 216–17, 219). X-ray of the lumbar spine showed mild scoliosis and an otherwise radiographically negative lumbar spine evaluation. (AR 218).

On July 11, 2014 Clemens was seen at El Rio for back and musculoskeletal pain. (AR 228). He reported fluctuating back pain, worse with flexion and jumping, and a three month history of musculoskeletal pain, occurring occasionally and improving. Pain level 6/10. (AR 230). Review of systems was negative and findings on exam were normal. (AR 229–30). The assessment was fibromyalgia, good control with medication, referred for PT; lumbar back pain, abnormal findings on x-ray and controlled with medication; and scoliosis, mild. (AR 231).

On July 14, 2014 Clemens had a physical therapy evaluation. (AR 214). He reported a history of low back pain, average 7/10 and 10/10 on a bad day, and difficulty sleeping due to pain. Clemens stated his back would lock up on occasion and that bending and lifting made the pain worse, but that otherwise he was in good health. The therapist noted a positive straight leg and altered reflexes and recommended PT twice a week for eight weeks.

On August 12, 2014 Clemens was seen at El Rio and reported his fibromyalgia occurred occasionally and was stable, neck pain was moderate and had worsened, and back pain was fluctuating, aching, and aggravated by changing positions. (AR 224). On exam, Clemens was positive for feeling down, depressed, or hopeless, and reported his pain was 7/10. (AR 225–26). He received injections in his back but had only a mild response. (AR 226–27). The assessment was invertebral disc disorder with radiculopathy of lumbar region, lumbar strain, scoliosis, cervicalgia, and fibromyalgia, and Clemens was prescribed Gabapentin and referred for imaging. (AR 227).

On September 4, 2014 Clemens was seen at El Rio for back pain, leg pain, and to

have disability paperwork completed. (AR 220). Clemens reported lower back pain aggravated by bending and flexion, and a two week history of aching upper leg pain, with pain 6/10. (AR 222). Review of systems was negative and all findings on exam were normal. (AR 221–22). The assessment was fibromyalgia, lumbar strain, and depression, and the doctor increased Gabapentin and Tramadol for pain and started Sertraline for depression. (AR 223).

On September 10, 2014 a venous duplex for the right lower extremity was negative. (AR 215).

On October 2, 2014 Clemens was seen at El Rio with a complaint of insomnia and heartburn and for a medication refill. (AR 211). He reported his joint pain was 8/10. (AR 212).

On January 19, 2015 Clemens saw Dr. Bhat to establish care and reported hip pain and a dislocated shoulder. (AR 381). Clemens reported occasional marijuana use and no alcohol use, bilateral hip pain, a history of back pain since age 15, history of scoliosis, muscle aches, joint pain, depression, and sleep disturbances, and said his previous doctor at El Rio diagnosed him with fibromyalgia and depression. (AR 382–83). On exam Clemens had normal mood and affect, normal motor strength and tone, normal gait and station, and tenderness to right shoulder. (AR 383). Dr. Bhat assessed depressive disorder, stable, continue Zoloft; chronic pain syndrome, counseled about management and meds; gastroesophageal reflux diseases, stable; insomnia, stable; recurrent shoulder dislocation; and primary fibromyalgia syndrome. (AR 384).

On February 18, 2015 Clemens saw Dr. Bhat for his annual physical. (AR 375). He reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, depression, and sleep disturbances. (AR 376–77). Dr. Bhat noted he could not prescribe narcotics because of Clemens's marijuana use. (AR 377). On exam Clemens had normal mood and affect, normal motor strength and tone, normal gait, and tenderness right shoulder. (AR 379–80). Dr. Bhat assessed diabetes, new problem; diabetic ketoacidosis; depressive disorder, not well controlled, increase Zoloft; chronic pain

syndrome, counseled on medications; gastroesophageal reflux disease, stable; and mixed hyperlipidemia, severe. (AR 380). An electrocardiogram was normal. (AR 363–64).

On March 4, 2015 Clemens saw Dr. Bhat for a diabetes follow-up. (AR 371). He reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, depression, and sleep disturbance. (AR 373). On exam Clemens had normal mood and affect, normal motor strength and tone, tenderness in right shoulder, and normal gait and station. (AR 374). Dr. Bhat assessed diabetes, fair; diabetic ketoacidosis; depressive disorder, better, continue Zoloft; chronic pain syndrome, counseled about medication and optimizing antidepressants and non-narcotic pain relievers, increased medications; gastroesophageal reflux disease, stable; and mixed hyperlipidemia, severe. A pulmonary function report was normal. (AR 362).

On March 18, 2015 Clemens saw Dr. Bhat for a follow-up and to discuss service animals and inhalers. (AR 368). Clemens reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, depression, and sleep disturbances. (AR 369–70). Dr. Bhat recommended an inhaler and smoking cessation, and opined that a service animal was not necessary for Clemens's diabetes or fibromyalgia. (AR 369). On exam Clemens had normal mood and affect, normal motor strength and tone, and normal gait. (AR 370–71). Dr. Bhat assessed diabetes, stable; hyperlipidemia, severe, begin statin; depressive disorder, stable, continue Zoloft; chronic pain syndrome, defer to specialist; and gastroesophageal reflux disease, stable. (AR 371).

On April 29, 2015 Clemens saw Dr. Bhat for a follow-up and reported random twitches in his arms and legs. (AR 466). He reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, numbness, depression, and sleep disturbances. (AR 468). On exam Clemens had normal mood and affect, normal tone and motor strength, normal gait, and no tremor. (AR 469). Dr. Bhat assessed restless legs, new problem; diabetes, at goal; mixed hyperlipidemia, at goal, depressive disorder, stable; gastroesophageal reflux disease, stable; chronic pain syndrome, defer to specialist; and recommended Clemens continue his medications. (AR 470).

On June 1, 2015 Clemens saw Dr. Bhat for a follow-up. (AR 463). He reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, numbness, depression, and sleep disturbances. (AR 464–65). On exam Clemens had normal mood and affect, normal tone and motor strength, and normal gait. (AR 465). Dr. Bhat assessed restless legs, uncontrolled; diabetes, at goal; mixed hyperlipidemia, at goal, depressive disorder, stable; gastroesophageal reflux disease, stable; chronic pain syndrome, defer to specialist; and recommended Clemens continue his medications. (AR 466).

On June 13, 2015 Clemens was seen at the Tucson Medical Center ER for amphetamine intoxication after taking one of his wife's pills so that he could stay up with her studying. (AR 258–317). He reported using marijuana once every few weeks when his pain was really bad and his medications were not working. (AR 290).

On June 14, 2015 Clemens had an x-ray of his right shoulder. (AR 352). The impression was "sequelae from chronic shoulder dislocation but no active dislocation at this time," "Bankart lesion is suspected in the inferior glenoid region, also present on a previous study from 01/09/2015," and "some shoulder laxity as well with some widening of the subacromial spaco."

On June 16, 2015 Clemens saw Dr. Bhat after being discharged from TMC. (AR 460). He reported no alcohol use and occasional marijuana use, muscle aches, joint pain, back pain, numbness, depression, and sleep disturbances. (AR 461–62). On exam Clemens had normal mood and affect, normal tone and motor strength, normal movement of all extremities, normal gait, and reflexes 2+ bilaterally. (AR 462). Dr. Bhat assessed sleep apnea and referred Clemens for a sleep study. (AR 463).

On July 20, 2015 Clemens saw Dr. Bhat for a follow-up. (AR 456). He reported no alcohol use and occasional marijuana use, sleep apnea, muscle aches, joint pain, back pain, numbness, depression, restless legs, and sleep disturbances. (AR 458). On exam Clemens had normal mood and affect, normal motor strength and tone, normal gait, and reflexes 2+ bilaterally. (AR 459). Dr. Bhat assessed sleep apnea, uncontrolled, await sleep study; restless legs, uncontrolled, continue medication; diabetes, at goal, continue

medication; mixed hyperlipidemia, at goal, continue medication; depressive disorder, stable, continue Zoloft; gastroesophageal reflux disease, stable; and chronic pain syndrome, defer to specialist. (AR 459).

On August 10, 2015 Clemens had a polysomnogram. (AR 439). The impression was moderate severe obstructive apnea and a CPAP was recommended; also noted that Clemens would have very little apnea if he slept on his side. (AR 440).

On August 31, 2015 Clemens saw Dr. Bhat for a follow-up. (AR 453). Clemens complained of a lot of pain and asked for a pain referral; he reported sleep apnea, muscle aches, joint pain, back pain, depression, and sleep disturbances. (AR 454). On exam his mood and affect were normal, normal motor strength and tone, normal gait, and reflexes 2+ bilaterally throughout. (AR 456). Dr. Bhat assessed fibromyalgia, referred to pain management specialist; sleep apnea, awaiting CPAP machine; restless legs, uncontrolled; diabetes, at goal, continue medication; mixed hyperlipidemia, at goal, continue medication; depressive disorder, stable, continue Zoloft; and gastroesophageal reflux disease, stable. (AR 456).

A September 22, 2015 neurology clinic note states that Clemens's examination and imaging studies were normal. (AR 476–77).

On December 7, 2015 Clemens was seen at the Pain Center of Arizona. (AR 503). He reported pain in his upper, mid, and lower back, neck, pelvis, hips, legs, feet, buttock, shoulders, hands, and fingers, as well as tingling and numbness, and rated his pain 8/10. Clemens stated that stairs, lifting, running, reaching, walking, bending, physical activity, driving, stress, coughing, standing, sneezing, and twisting all made his pain worse, and lying down, stopping activity, avoiding stress, and applying heat relieved it. Clemens reported occasional alcohol and marijuana use, sleep disturbances, indigestion, abdominal pain, joint pain, muscle weakness, stiffness, muscle aches, falling down, and poor balance. (AR 504). On exam Clemens had a slow gait but not antalgic, slight sensory impairment bilateral toes, normal strength, positive Tinel's bilateral wrists, and straight leg raise positive for exacerbation of back pain. (AR 505). Dr. Rabe's impression was

neck pain, back pain, knee pain, carpal tunnel syndrome, and alcoholic neuropathy, and he recommended x-rays and trigger point injections. (AR 506).

On February 2, 2016 Clemens was seen by Dr. Rabe and reported initial relief from the injections but it didn't last. (AR 516). Clemens reported fatigue, abdominal pain, muscle cramps, weakness, and aches, joint pain, stiffness, back pain, headaches, tingling, poor balance, numbness, difficulty concentrating, coordination problems, anxiety, and depression. (AR 516–17). Clemens had sensitive areas over the bilateral lumbar paraspinal muscles and a positive jump sign, and Dr. Rabe administered injections. (AR 518). Dr. Rabe assessed myalgia and lower back pain, both deteriorated.

At a March 21, 2016 neurology clinic appointment Clemens reported new problems of peripheral neuropathy, headaches, and RLS and stated that he smoked marijuana to alleviate his symptoms. (AR 498). Clemens had a normal exam and the doctor recommended testing to evaluate the neuropathy. (AR 499).

On April 1, 2016 Clemens reported his pain was more severe and interfered with most of his daily activities. (AR 511). He had no relief from the injections. (AR 514). Clemens was positive for leg cramps with exertion, indigestion, joint pain, stiffness, muscle weakness, back pain, muscle aches, tingling, poor balance, difficulty concentrating, anxiety, and depression. (AR 512). On exam he had normal gait, normal range of motion, straight leg raise positive for pain, hypoesthesia bilateral lower extremities, lumbar spine tender to palpation, and no anxiety, depression, or agitation. (AR 513). PA-C Hair assessed new problems of lumbar radiculopathy and fibromyalgia, and recommended a MRI of the lumbar spine and prescribed new medications. (AR 513–14).

An April 19, 2016 needle exam of the right lower extremity was abnormal and showed L5-S1 radiculopathy; the bilateral nerve conduction studies were within normal limits. (AR 526).

On April 29, 2016 Clemens reported headaches and back pain, 8/10, swelling of hands and feet, joint pain, stiffness, muscle weakness and aches, tingling, and poor

balance. (AR 538). On exam, Clemens had a slightly antalgic gait and was using a cane, normal muscle tone and strength, normal range of motion, tenderness of the bilateral lumbar paraspinous, normal coordination, reflexes 2+, hypoesthesia bilateral lower extremities, and no depression, anxiety, or agitation. (AR 540). PA-C Hair assessed lumbar radiculopathy, unchanged; fibromyalgia, unchanged; low back pain, unchanged; and recommended increasing Lyrica and Diclofenac.

B.    State Agency Consulting Physicians

On March 25, 2015 Clemens was seen by Dr. Weinberg for a physical consultative examination. (AR 241). Clemens reported pain in his upper and lower back and knees, and said that he had scoliosis as a child and had shooting pains in his back for years. Clemens also reported a recent diagnosis of diabetes and right shoulder surgery two years prior for an injury. He stated that he did not use alcohol or cannabis.

On exam, Dr. Weinberg noted that Clemens did not make good eye contact, moved very slowly, had an extremely flat affect, and never smiled. (AR 242). His gait was slow, he could do tandem gait, did not do well with heel-toe walking or hopping, and he could squat fully and get himself up. Clemens's reflexes were 2+ throughout and there was no tenderness to the spine on light palpation. He had normal range of motion of the spine, left shoulder, elbows, wrists, hips, knees, and ankles; range of motion of the right shoulder was limited to 80 percent. Dr. Weinberg noted no abnormality of any joints, muscle strength testing 5/5 bilaterally, normal sensation, and grip strength 5/5 left hand and 4/5 right hand with decreased effort. Dr. Weinberg made the following diagnosis:

> 1. Chronic pain syndrome with upper and lower back pain plus knee pain, although normal examination of the back and knees with no obvious scoliosis seen on physical exam.
>
> 2. Status post right shoulder surgery with some mild limitation of flexion and abduction of the right shoulder.
>
> 3. Chronic depression.

Dr. Weinberg also completed a Medical Source Statement of Ability to do Work-Related Activities and stated that Clemens's conditions would impose limitations for 12

continuous months. (AR 246). He opined that Clemens could lift 20 pounds occasionally and 10 pounds frequently, had no limitations in standing, walking, or sitting, could frequently climb, stoop, kneel, crouch, crawl, reach, handle, finger, and feel, and no environmental restrictions. (AR 246–47).

On April 20, 2015 Clemens saw Dr. Wiggins for a psychiatric examination. (AR 249). Clemens reported a history of fibromyalgia, nerve damage originating in childhood that went undiagnosed, scoliosis, and a history of mental health treatment during adolescence. Clemens stated that he was depressed after his grandfather died and went to therapy for six months; his depression has been consistent but he has had no therapy since that time. (AR 250). His depression has worsened with his medical issues and he is easily angered and irritated; he takes Sertraline prescribed by his PCP. (AR 251). Clemens also reported a history of substance and alcohol use, with current minimal alcohol and marijuana use. (AR 250). He does some light housekeeping, cooking, and grocery shopping depending on his pain level, and spends his days watching television and playing computer games. (AR 250).

On exam, Dr. Wiggins noted that Clemens's mood was mildly dysthymic but he was engaging and his affect was congruent with his mood. (AR 251). His behavior, speech, and thought processes were all normal, his insight and judgment were fair, and his memory was grossly intact. Dr. Wiggins diagnosed persistent depressive disorder, early onset, moderate, with mixed features. He also noted that Clemens gave inconsistent statements regarding his current alcohol and drug use, first stating he had been sober for 10 years and then stating he drank occasionally and smoked marijuana if offered.

Dr. Wiggins also completed a Psychiatric/Psychological Medical Source Statement and stated that Clemens's conditions would impose limitations for 12 months. (AR 253). He opined that Clemens had no difficulty in understanding, memory, and adaptation, might have difficulty maintaining regular attendance due to depression, and depression may limit motivation for social interaction and ability to get along with coworkers.

C.    State Agency Reviewing Physicians

On October 22, 2014 DDS physician Dr. Novak made an initial determination that Clemens was not disabled because although his condition was currently severe, it was expected to improve. (AR 63–64). Dr. Woodard opined that based on the medical evidence of record, Clemens had no severe issues and should be able to perform all activities associated with substantial gainful employment. (AR 60). Dr. Novak completed a psychiatric review and found no difficulties under the Paragraph B criteria, and noted that Clemens did not allege any psychiatric issues and had no psychiatric treatment. (AR 61). DDS Examiner Taylor Heimann found that Clemens's allegations were non-severe and that his x-rays and imaging did not show any severe degeneration that would limit his ability to perform activities. (AR 63).

On reconsideration, Murchison was again found not disabled because the medical evidence did not show any impairments that would significantly limit his ability to work. (AR 76). DDS Examiner Cindy Yates noted that Clemens did not allege any changes on reconsideration or any psychiatric issues. (AR 70–71). Dr. Fina found that the consultative examination limited Clemens too severely because there were no joint abnormalities, no effusions, no muscle spasms, no atrophy, and all imaging was normal, and there was nothing to support any disability. (AR 72). Dr. Campbell noted no difficulties under the Paragraph B criteria and found that Clemens's depression was non severe. (AR 73).

D.    Plaintiff's Testimony

On a Function Report dated October 7, 2014 Clemens reported that he cannot bend, move, lift, squat, stand, reach, walk, sit, kneel, climb stairs, or use his hands because of his conditions. (AR 162, 167). In a typical day he gets up, walks the dog, takes his medications after each meal, and goes to bed; sometimes the pain keeps him awake and he can't get comfortable. (AR 163). He can care for himself but sometimes needs help dressing; he prepares his own meals, does the dishes, and shops, but does not go out alone in case he needs help getting up. (AR 164–65). His hobbies are television, reading,

computer, and small walks, and he spends time with others watching tv and movies and shopping. (AR 166). He can walk for 100 feet before needing to rest for 5–10 minutes, can pay attention for 30 minutes, and is able to follow instructions and finish what he starts. (AR 167). He uses a non-prescribed cane for walking and getting up. (AR 168).

At his hearing before the ALJ on March 30, 2016 Clemens testified that he could sit for 30 minutes and then his back would start to hurt, and he would have to walk around for 30 minutes and maybe stretch and take his pain medications before sitting back down. (AR 39–40). His back locks up once every 2–3 weeks and then it lasts for 1– 2 weeks. (AR 43). He can be on his feet for 30 minutes and then his legs start to get weak (AR 40), and he uses a cane to help with balance because he has fallen over and hit his head (AR 44). He has severe back pain, muscle weakness, numbness in his legs and arms, he drops things often, his legs are getting weaker, and he doesn't sleep well because of his restless leg syndrome. (AR 42–43, 47). He can lift no more than a gallon of milk, and has issues with depression and anxiety that started in 2014 when he was diagnosed with diabetes. (AR 43). Clemens experiences pain every day, all over his body. Injections did not help him; narcotics do help but he doesn't like to take them and his doctor doesn't like prescribing them. (AR 44–45).

Clemens is homeless and lives in a tent, and it hurts to sleep on the ground and his pain gets worse with the cold. (AR 47). He spends his days sitting around, reading, and doing a little walking, and then he will sit back down and wait for his back to stop hurting and his legs to stop going numb. (AR 47–48).

Clemens first stated that he had not done any drugs since his AOD, then clarified that his drug test in June 2015 was positive for marijuana because he was near someone who was smoking, and was positive for amphetamines because he had taken a pill prescribed to his wife to try to stay awake and focus. (AR 40–41).

E.    Vocational Testimony

At the hearing before the ALJ, Stephen Davis testified as a vocational expert. He stated that Clemens's past work as security guard and waiter was semi-skilled and light,

performed at medium. (AR 51). Davis testified that someone who could only sit for 30 to 60 minutes and would then have to walk around for 30 minutes, could only stand for 30 minutes, and could only lift a gallon of milk could not perform any jobs because it would be too much time off task. (AR 51–52).

### F.    ALJ's Findings

The ALJ found that Clemens had the medically determinable impairments of fibromyalgia, scoliosis, and joint/muscle pain. (AR 23). The ALJ further found that Clemens did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activities for 12 consecutive months and that therefore he did not have a severe impairment or combination of impairments.

The ALJ found that Clemens's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible because the objective medical evidence did not collaborate the symptoms and limitations alleged by Clemens. (AR 24–25). Specifically, the ALJ noted the following: a right shoulder x-ray from June 2015 showed no active dislocation and a Bankart lesion and some shoulder laxity was suspected; in August 2014 Clemens reported his fibromyalgia occurred occasionally but was stable, he had good control with medication, and his exam was normal; findings for a Venous Color Duplex on the right lower extremity were negative; x-ray of the left hip showed no acute findings; x-rays of the bilateral knees were negative; x-ray of the lumbar spine in June 2014 showed mild scoliosis; x-ray of the thoracic spine was negative; pulmonary function test was normal; electrocardiogram showed regular rate and normal sinus rhythm; an April 2015 exam with Dr. Bhat was normal; in December 2015 Clemens had a slow gait but not antalgic, slight sensory impairment in bilateral toes, 5/5 strength, positive Tinel's sign in bilateral wrists, straight leg raise exacerbated back pain, and good range of motion of bilateral knees; Clemens gave inconsistent statements about his drug and alcohol use; Clemens had largely normal physical and neurological exams at the Center for Neurosciences; and in April 2016 his diabetes was controlled with medication and a EMG was positive for right sciatic radiculopathy. (AR 25–26).

The ALJ gave significant weight to Dr. Fina's opinion that there was nothing to support a finding of disability because the opinion was consistent with the medical evidence and the consultative examiner opinions. (AR 26).

The ALJ gave partial weight to Dr. Weinberg's opinion that Clemens was limited to light exertional work because it was consistent with the medical evidence and the opinions from other specialists. (AR 27).

The ALJ gave substantial weight to Dr. Campbell's opinion that Clemens's psychiatric disorder was non-severe because the opinion was consistent with the medical evidence and because as a specialist for the SSA, Dr. Campbell was "well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act." (AR 27). The ALJ discussed Dr. Wiggins's psychological opinion but did not assign it a specific weight.

The ALJ gave little weight to nurse practitioner Reno Truisilo's opinion that Clemens had multiple marked limitations because the opinion was not supported by the medical evidence, because as a psychiatric mental health nurse practitioner she was not an acceptable medical source and therefore her opinion was not entitled to controlling weight, because the opinion was "inconsistent with the record as a whole and in fact seems to depart from the other clear findings of other treating sources without adequate explanation for the difference," because it was based more upon Clemens's subjective and self-reported limitations rather than a review of the record as a whole, and because Truisilo lacked the benefit of a longitudinal relationship with Clemens. (AR 27–28).

The ALJ concluded that Clemens had failed to point to objective clinical evidence to support his allegations and that he was not disabled. (AR 28).

### III.    Standard of Review

The Commissioner employs a five-step sequential process to evaluate SSI and DIB claims. 20 C.F.R. §§ 404.920, 416.1520; *see also Heckler v. Campbell*, 461 U.S. 458, 460–462 (1983). To establish disability the claimant bears the burden of showing he (1) is not working; (2) has a severe physical or mental impairment; (3) the impairment

meets or equals the requirements of a listed impairment; and (4) the claimant's RFC precludes him from performing his past work. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4). At Step Five, the burden shifts to the Commissioner to show that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, she does not proceed to the next step. 20 C.F.R. §§ 404.920(a)(4), 416.1520(a)(4).

In this case, Clemens was denied at Step Two of the sequential evaluation process. At Step Two, the ALJ must determine whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 416.920(a)(4)(ii). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs" including:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 140.1521(b).

The findings of the Commissioner are meant to be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3). The court may overturn the decision to deny benefits only "when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001). As set forth in 42 U.S.C. § 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"

*Valentine*, 574 F.3d at 690 (internal quotation marks and citations omitted), and is "more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. The Commissioner's decision, however, "cannot be affirmed simply by isolating a specific quantum of supporting evidence." *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998) (internal citations omitted). "Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland*, 257 F.3d at 1035 (internal quotations and citations omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (internal citations omitted).

Additionally, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). The claimant bears the burden to prove any error is harmful. *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (citing *Shinseki v. Sanders*, 556 U.S. 396, 129 S. Ct. 1696, 1706 (2009)). An error is harmless where it is "inconsequential to the ultimate nondisability determination." *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted); *see also Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006). "[I]n each case [the court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115. In other words, "an error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." *Id*. (internal quotation marks and citations omitted). Finally, "[a] claimant is not entitled to benefits under the statute unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors

may be." *Strauss v. Comm'r Soc. Sec.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

## IV.  Analysis

Clemens argues that it was error for the ALJ to find that his medically determinable impairments were not severe and end the sequential inquiry at Step Two. (Doc. 19). Clemens further argues that the ALJ applied the wrong legal standard to assess his subjective symptom testimony and improperly negatively assessed his credibility, and used Clemens's statements regarding his drug and alcohol usage to judge his character.

The Commissioner argues that the Court should affirm the ALJ's decision because the ALJ properly pointed to substantial evidence in the record to support the finding that Clemens's impairments did not cause significant limitations on his ability to work and were therefore non severe. (Doc. 20). The Commissioner further argues that Clemens fails to show how the outcome would have changed if the ALJ had applied SSR 16-3p, and that while the ALJ did discuss Clemens's credibility, he focused on whether Clemens's claims were supported by the evidence. Finally, the Commissioner contends that even if the ALJ did improperly comment on Clemens's drug and alcohol use in relation to his character or trustworthiness, the error was harmless.

The Court concludes that the ALJ erred in finding that Clemens's medically determinable impairments were not severe at Step Two of the sequential evaluation process. The Court further finds that the ALJ erred by failing to assess Clemens's subjective symptom testimony in accordance with SSR 16-3p. These errors were not harmless, and the Court finds remand for further administrative proceedings is appropriate. The Court rejects Clemens's request to remand for an immediate award of benefits because questions remain regarding whether in fact Clemens is disabled within the meaning of the SSA and whether he is able to perform any work existing in the national economy.

### A.  Step Two Finding

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Thus,

> At step two of the sequential process, the ALJ must conclude whether Plaintiff suffers from a "severe" impairment, one which has more than a slight effect on the claimant's ability to work. To satisfy step two's requirement of a severe impairment, the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice.

*Orellana v. Astrue*, 547 F. Supp. 2d 1169, 1172 (E.D. Wash. 2008) (citing 20 C.F.R. §§ 404.1508; 416.908).

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290). Thus, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting SSR 85-28).

The Supreme Court has recognized that including a severity requirement at Step Two of the sequential evaluation process "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen*, 482 U.S. at 153. However, an overly stringent application of the severity requirement violates the SSA by denying benefits to claimants who do meet the statutory definition of disabled. *Corrao v. Shalala*, 20 F.3d 943, 949 (9th Cir. 1994).

The fact that a claimant has been diagnosed with and treated for a medically

determinable impairment does not necessarily mean the impairment is "severe," as defined by the SSR. *See, e.g., Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Key v. Heckler*, 754 F.2d 1545, 1549–50 (9th Cir. 1985). To establish severity, the evidence must show the diagnosed impairment significantly limited the claimant's physical or mental ability to do basic work activities for at least 12 consecutive months. 20 C.F.R. § 416.920(c).

B.    Evaluation of Fibromyalgia

Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). In 2012, the SSA published SSR 12-2p to "provide[] guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." Pursuant to SSR 12-2p, once fibromyalgia is established as a medically determinable impairment, "we then evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work."

"Fibromyalgia is a disease that eludes objective evidence." *Satterwaite v. Astrue*, 781 F.Supp.2d 898, 909 (D. Ariz. 2011). As the Ninth Circuit has observed,

> Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms . . . Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease.

*Benecke*, 379 F.3d at 590 (internal citations omitted). Further,

> What is unusual about the disease is that those suffering from it have muscle strength, sensory functions, and reflexes that are normal. Their joints appear normal, and further musculoskeletal examination indicates no objective joint swelling. Indeed, there is an absence of symptoms that a lay person may ordinarily associate with joint and muscle pain. . . . There are no laboratory tests to confirm the diagnosis.

*Cash v. Berryhill*, 2018 WL 571940 at *8 (C.D. Cal. Jan. 26, 2018); *see also Satterwaite*, 781 F.Supp.2d. at 912 ("fibromyalgia patients may present no objectively alarming signs and may manifest normal muscle strength and neurological reactions and have a full range of motion." (internal quotations and citations omitted)). "Given the nature of fibromyalgia, a claimant's subjective complaints of pain are often the only means of determining the severity of a patient's condition and resulting functional limitations." *Satterwaite*, 781 F.Supp.2d at 912.

C.    Analysis

Here, the ALJ rejected Clemens's subjective allegations as not credible because the objective medical evidence did not collaborate the symptoms and limitations alleged by Clemens. (AR 24–25). However, in so finding, the ALJ failed to construe the medical evidence "in light of fibromyalgia's unique symptoms and diagnostic methods," *Revels v. Berryhill*, 874 F.3d 648, 662 (9th Cir. 2017), and thus "erred by effectively requir[ing] objective evidence for a disease that eludes such measurement." *Benecke*, 379 F.3d at 594 (internal quotations and citation omitted). While the ALJ cited normal examination findings from some of Clemens's medical appointments, this points to the ALJ's unfamiliarity with the diagnosis and treatment of fibromyalgia as a "disease [that] is diagnosed entirely on the basis of patients' reports of pain and other symptoms," *Benecke*, 379 F.3d at 590, and the fact that "fibromyalgia patients may present no objectively alarming signs." *Satterwaite*, 781 F.Supp.2d at 912. The ALJ overlooks the significance of the fact that Clemens has consistently complained of diffuse pain affecting many parts of his body, and that his treating physicians diagnosed and treated Clemens for fibromyalgia and chronic pain. Normal findings on examination are not inconsistent with Clemens's fibromyalgia diagnosis, especially given his consistent reports of pain, fatigue, and sleep disturbance, and the ALJ's "[s]heer disbelief is no substitute for substantial evidence." *Benecke*, 379 F.3d at 594. Furthermore, the ALJ erred by failing to comply with SSR 16-3p, which directs ALJs to focus on evaluating a claimant's symptoms, not his or her character or truthfulness, and which further

specifically notes that "[s]ymptoms cannot always be measured objectively though clinical or laboratory diagnostic techniques."

As such, this Court cannot conclude that substantial evidence supports the ALJ's finding that Clemens's fibromyalgia had no more than a minimal effect on his ability to work. Moreover, the ALJ did not find any other severe impairments and thereby stopped the sequential evaluation at Step Two. Such error is not harmless—"[t]he ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that [Clemens's] claim was 'groundless.'" *Webb*, 433 F.3d at 688 (citing *Smolen*, 80 F.3d at 1290).

## V. Remedy

A federal court may affirm, modify, reverse, or remand a social security case. 42 U.S.C. § 405(g). Absent legal error or a lack of substantial evidence supporting the ALJ's findings, this Court is required to affirm the ALJ's decision. After considering the record as a whole, this Court simply determines whether there is substantial evidence for a reasonable trier of fact to accept as adequate to support the ALJ's decision. *Valentine*, 574 F.3d at 690.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989) (*quoting Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke*, 379 F.3d at 593. Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* (citations omitted). Where the test is met, "we will not remand solely to allow the ALJ to make specific findings.... Rather, we take the relevant testimony to be established as

true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester*, 81 F.3d at 834.

Here, the Court finds remand for further administrative proceedings is appropriate because the ALJ erred in finding "that the medical evidence clearly established [Clemens's] lack of a medically severe impairment or combination of impairments." *Webb*, 433 F.3d at 688. In light of the ALJ's dismissal at Step Two, issues remain regarding Clemens's residual functional capacity and his ability to perform work existing in significant numbers in the national economy. Moreover, although Clemens's medically determinable impairments may be considered severe, this Court offers no opinion as to whether Clemens is disabled within the meaning of the Act.

## VI. Conclusion

In light of the foregoing,

**IT IS HEREBY ORDERED** that the Commissioner's decision is remanded back to an ALJ with instructions to issue a new decision regarding Clemens's eligibility for disability insurance benefits. The ALJ will give further consideration to all of the previously submitted medical records, reassess Clemens's subjective symptom testimony in accordance with SSR 16-3p, further develop the record as needed to fully and fairly assess Clemens's conditions and limitations, and continue the sequential evaluation process to assess whether in fact Clemens is disabled within the meaning of the SSA and whether he is able to perform any work existing in the national economy.

**IT IS FURTHER ORDERED** the Clerk of the Court shall enter judgment and close its file on this matter.

Dated this 19th day of March, 2018.

Eric J. Markovich
United States Magistrate Judge